**In re HANOVER SQUARE SECURITIES GROUP, INC., Debtor.**

**Adv. No. 83 6155 A.**

**TP 70056.**

United States Bankruptcy Court, S.D. New York.

Nov. 5, 1984.

Hughes, Hubbard & Reed, New York City, for the trustee.

Bressler, Lipsitz & Rothenberg, New York City, for Citiwide Sec. Corp.

## DECISION AND ORDER ON APPLICATION TO LIFT THE AUTOMATIC STAY TO PERMIT SETOFFS

EDWARD J. RYAN, Bankruptcy Judge.

On December 8, 1983 Hanover Square Securities, Inc. (Hanover) was suspended by The New York Stock Exchange (NYSE) and, pursuant to a proceeding commenced by the Securities and Exchange Commission (SEC), consented to entry of a judgment prohibiting it from trading securities while in violation of the Securities and Exchange Act of 1934.

This liquidation was initiated by the Securities Investor Protection Corporation (SIPC) pursuant to the Securities Investor Protection Act (SIPA) on December 8, 1983 in the U.S. District Court for the Southern District of New York. By order of the district court on that day all actions by creditors, including setoffs, were stayed. On December 15, 1983 the district court

signed a second order which, among other things appointed James W. Giddens Trustee for the liquidation of Hanover's business, continued the automatic stay under 11 U.S.C. § 362(a) of the Bankruptcy Code and 15 U.S.C.A. § 78eee(b)(2)(B)(iii) (1981) (SIPA), and removed the liquidation proceedings to this court.

Hanover was a broker-dealer whose business activities and finances were subject to regulation by the SEC and The New York Stock Exchange (NYSE). A portion of Hanover's business was the clearing of trades in securities for other broker-dealers, one of which was Citiwide Securities Corp. (Citiwide).

In October, 1983 Hanover had fallen into severe financial difficulties. During the weekend of October 22–23, 1983 Hanover had negotiated agreements with a number of broker-dealers with which it did business. Each of the broker-dealers, including Citiwide, agreed to make contributions of capital which were to be treated under applicable NYSE and SEC rules as "subordinated obligations" or net capital purposes by Hanover.

The purpose of the agreement was to provide Hanover with additional "net capital" to be available for the protection of its customers. Pursuant to SEC regulations, broker dealers are not permitted to allow their net capital to be less than two percent of their aggregate debt items. See Rule 15(c)(3)–(1)(a), 17 CFR § 240.15(c)(3)–(1)(a) (1984). Subordinated loans and demand notes secured by collateral are not included in the aggregate debt amount because such amounts are deemed to be available to satisfy customer claims. 17 CFR § 240.-15(c)(3)–1(c) and (f).

The agreement entered into between Hanover and Citiwide was comprised of three interrelated instruments. The first was a Secured Demand Note (SDN) in the principal amount of $645,000. The $645,-000 amount was later reduced to $300,000 to comply with the SEC's net capital restrictions on Citiwide. The second instrument was a Secured Demand Note Collateral Agreement, dated October 24, 1983 (Collateral Agreement). The third instrument was a Registered Subordinated Debenture, which was never executed.

The Collateral Agreement was in effect the subordination agreement between the parties, and the SDN represented the collateral guaranteeing the agreement.

Citiwide seeks an order vacating the automatic stay against setoffs, declaring that Citiwide had a right to setoff Citiwide's alleged indebtedness of $300,000 on the Secured Demand Note against an equal amount owed by Hanover Square to Citiwide pursuant to 11 U.S.C. § 553 and ordering the Trustee to pay to Citiwide $300,-000, purportedly representing "cash collateral" held as a guarantee to Citiwide's performance under the SDN.

Citiwide claims that because Hanover has made no formal demand for payment under the terms of the SDN, Citiwide has the right either to substitute collateral of equal value for the collateral originally pledged under the collateral agreement or to satisfy the terms of the SDN and to obtain return of the original collateral held by Hanover. Citiwide reasons, that by offsetting its obligation under the SDN with a corresponding obligation owed by Hanover to Citiwide, the terms of the SDN are satisfied, thereby allowing for the release of $300,000 cash collateral to Citiwide. Additionally, Citiwide contends that the capital contribution under the SDN and Collateral Agreement was to be treated as subordinated capital only for the regulatory purposes of the SEC and New York Stock Exchange.

Hanover contends that its debt of $645,-000 to Citiwide was subordinated to senior debt holders to the extent of $300,000. The debtor argues that the subordination was to occur in the "event of financial restrictions" which is defined in the Collateral Agreement to include "the appointment of a receiver or trustee or any liquidation pursuant to SIPA of 1970." According to the debtor, no formal demand for payment from Citiwide was necessary to trigger the subordination provision of the Collateral Agreement.

A careful scrutiny of the interrelated instruments indicates that the parties clearly intended to enter into a subordination agreement. Paragraph 12 of the Collateral Agreement specifically provides that "in the event of the appointment of a receiver or a trustee of the organization or in the event of its insolvency, liquidation ("SIPA") or its bankruptcy ... the undersigned (Citiwide) shall not be entitled to participate or share ... in the distribution in the assets of the organization (Hanover Square) until all claims of all present and future creditors of the organization are satisfied." [names inserted].

Citiwide owes no debt to Hanover, nor has any "cash collateral" been set aside in Citiwide's favor. Under the terms of the collateral agreement Citiwide agreed to subordinate $300,000 of the $645,000 owed by Hanover to Citiwide to other senior debt holders of Hanover. The SDN represents Citiwide's underlying guarantee of its agreement to Hanover.

The fact that Hanover has made no demand of payment from Citiwide under the SDN is of no moment. The provisions of the SDN "are subject in all respects to the provisions of the Collateral Agreement." The collateral agreement as pointed out above provides that upon an event of financial restriction Citiwide's claim of $300,000 becomes subordinated. Therefore, Hanover's failure to demand payment under the SDN does not affect Citiwide's obligation under the Collateral Agreement.

Citiwide's argument that the SDN and collateral agreement gave rise to a mutually owing obligation to the extent of $300,-000 from Citiwide to Hanover is misguided. There exists only one debt that of Hanover's $645,000 obligation to Citiwide. Citiwide's agreement to subordinate $300,000 of its claim against Hanover does not give rise to a "mutual debt" under the setoff provisions of 11 U.S.C. § 553. *See, 4 Collier on Bankruptcy*, § 553.02 at 553–10, 11 (15th Ed.1983).

Accordingly, Citiwide's motion to lift the automatic stay so to permit setoffs is denied.

It is ordered.